## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                )
                                      )
LORENZO P. KUNZE,                      )      Case No. 13-13936- HRT
                                      )      Chapter 13
           Debtor.                     )
                                      )

---

## ORDER ON MOTION TO CONFIRM SECOND AMENDED PLAN

---

THIS MATTER is before the Court on the Motion to Confirm the Amended Chapter 13 Plan (the "Motion"), filed by Lorenzo P. Kunze (the "Debtor") in the above-captioned case.  The Court held an evidentiary hearing on the Motion on October 7 and October 9, 2013, (the "Hearing") has considered the objection filed by creditors ELI and the Flukens (as defined below), has examined the evidence and arguments presented, has reviewed its docket, and is ready to rule.

I.      BACKGROUND FINDINGS

A.      Debtor's Sale of Electrology Laboratory, Inc.

1.      Prior to December 2009, the Debtor owned one hundred percent of the outstanding equity in the Colorado corporation, Electrology Laboratory, Inc. ("ELI"). ELI was, and remains, a vocational school under the auspices of the State of Colorado Department of Education with a curriculum focused on the training of laser technicians for future employment in the skin care, tattoo removal, and related business ventures. ELI does business as Rocky Mountain Laser College ("RMLC").  Once students completed their training with RMLC, they would receive the designation as a "Certified Laser Specialist" ("CLS") which is a certificate solely of the Debtor's creation.  *See* Debtor's Exhibit A.  There is no evidence that there are any established prerequisites to receive a CLS beyond completing a course at RMLC; however, it was a key selling point to attract students to RMLC.

2.      The sale of the Debtor's equity interest in ELI to Ray Fluken, Jody Riggs Fluken, and Jessica Riggs[1] (collectively, the "Flukens") was concluded pursuant to a Purchase and Sale Agreement dated December 22, 2009 (the "PSA").  *See* ELI's Exhibit G.  According to this agreement, the purchase price for the Debtor's equity interest was $1,000,000 composed of a cash amount of $750,000, and a promissory note payable from the new ELI shareholders, the Flukens, to the Debtor in the original principal amount of $250,000.

---

[1] Ray Fluken and Jody Riggs Fluken are husband and wife.  Jessica Riggs is Jody Riggs Fluken's daughter and Ray Fluken's step-daughter.

3.      ELI, Ray Fluken, Jody Riggs Fluken and Jessica Riggs have each filed claims against the Debtor's bankruptcy estate in the amount of $779,030.  *See* claim numbers 10, 11, 12 and 13 respectively (collectively, the "Claims").  None of the Claims have been objected to by the Debtor.  The Debtor listed the Claims in his schedules as disputed.

4.      The PSA provided for the sale of one hundred percent of ELI's stock to the Flukens.  This was not an asset purchase agreement where the buyer and seller agree to a list of assets to be sold; all of ELI's equity, and thereby assets and liabilities, was transferred from the Debtor to the Flukens upon the closing of the sale.

5.      In connection with the sale of the equity interest, the Debtor agreed to serve as an independent contractor for ELI pursuant to an Independent Contractor Agreement ("ICA") dated December 23, 2009.  The ICA provided that the Debtor would continue to work at ELI as an independent contractor due to his extensive knowledge of the business and his industry contacts.  *See* Debtor's Exhibit 1, Article 5.  The inclusion of the Debtor's knowledge of the school and the laser industry were essential to the Flukens at the time they executed the PSA and ICA.  The Debtor pledged to act in the best interest of ELI during his tenure as an independent contractor according to the explicit terms of the ICA.

6.      While enrolling students at RMLC was a revenue source for ELI, the most significant source of income was from the sale of lasers to former students.  Once the students received their CLSs many would need to purchase a laser in order to start their profession.  In this way, RMLC's student list served as ELI's customer list.  *See* ELI's Exhibit H.

B.      Dispute between the Debtor and the Flukens

7.      At some point subsequent to the closing of the sale, the business relationship between the Flukens and the Debtor soured.  As it turns out, the Flukens had reason for concern.  Both before and after the execution of the PSA, the Debtor carried out a number of acts that were in his interest alone, not that of ELI, and were in violation of his ICA.  From the start, the Debtor misrepresented, exaggerated, or embellished his professional experience as stated on his curriculum vitae.  *See* ELI's Exhibit U.  For example, he listed organizations of which he was not a member, publications in which he may have been mentioned but to which he did not contribute, and professional experience that he did not have.  His brochures for RMLC stated that the college had trained 4,500 CLS's worldwide.  The Debtor testified that this was an exaggeration.  At one point, he went so far as to call himself a "doctor" even though according to his testimony he had no higher education than a handful of classes at Red Rocks Community College.

8.      As discussed above, the ICA was an integral part of the sale transaction. Even so, prior to the closing of the ELI sale, the Debtor was communicating via e-mail with Ed Barbera and Mike Sparks at a large laser company.  *See* ELI's Exhibit E.  In those e-mails, the Debtor was proposing to sell lasers for that company allegedly in violation of the non-compete provision of the Debtor's ICA.

9.      After the sale closed, the Debtor asked his receptionist in December 2010, to compile an RMLC student list which was in reality its customer list.  *See* ELI's Exhibit L.  The

Debtor did not deny that he obtained the student list from ELI in this way. He testified that he did so out of genuine concern for the students' well-being, not for the purpose of selling the former students lasers. However, the Debtor e-mailed Ben Elliot, a former student, which he admitted was done without ELI's permission. The Debtor stated that after he sold RMLC, the Flukens were "going a different direction than I had envisioned…" *See* ELI's Exhibit AA. The Debtor offered to sell Mr. Elliot laser equipment because the Debtor was then part of Quanta which, according to the Debtor's e-mail, is a large laser tattoo removal company. The Debtor also stated that his son could teach Mr. Elliot how to use the Quanta lasers.

   10.    The student list was not the only ELI asset that the Debtor appropriated for his personal enrichment. The Debtor taught a class in Bellevue, Washington using the name "American Laser College" but using RMLC's course material. This course was not approved by the Flukens and was in violation of the ICA. The brochure for the course used both the names "American Laser College" and "Rocky Mountain Laser College" which the Debtor testified he used interchangeably even though American Laser College was the Debtor's enterprise and RMLC was not. *See* ELI's Exhibit P. The Debtor testified that the course material was not proprietary so that he felt he was free to use it. Similarly, the Debtor used pictures from RMLC in his brochure for another unauthorized clinic he taught in Houston, Texas. *See* ELI's Exhibit Y. The Debtor stated that he had conferred with the Flukens prior to teaching the class in Houston; however, when asked to read from his 2011 deposition testimony, the Debtor read that prior to teaching the class in Houston, the Debtor had not conferred with the Flukens. (October 7, 2013 Hearing Transcript 103:12-16).

   11.    The benefit of graduating from RMLC was the receipt of a CLS. When the Flukens bought ELI, it was their understanding that a CLS certificate could only be obtained from RMLC. However, the Debtor continued to use that designation at classes he taught outside of RMLC unbeknownst to the Flukens. He used the designation of a CLS on his brochure for his new business, Rock Creek Laser, *see* ELI Exhibit W, and on Rock Creek Laser's website, www.laserlaser.com. While the Debtor testified that he objected to third parties conferring a CLS when he owned RMLC, he used it liberally after he had sold the school. On one hand, the Debtor claimed that it was just a meaningless label while on the other, the Debtor applied for a trademark of the term "Certified Laser Specialist" after he was eventually fired from ELI. *See* ELI's Exhibit V.

   12.    Further damaging to ELI was the Debtor's use of "metitags" on his own www.laserlaser.com website. Metitags are the imbedded code in a website that internet search engines use to locate webpages. The www.laserlaser.com metitags were written such that an internet search for "Rocky Mountain Laser College" would first direct the searcher to the www.laserlaser.com website. *See* ELI's Exhibit Z.

   13.    As a result of the deterioration of the relationship of the parties, the Debtor and ELI entered into an amendment to the ICA dated April 4, 2011 (the "Amended ICA"). *See* Debtor's Exhibit 2. Among the other provisions of the Amended ICA, the Debtor agreed to a reduction in the amount owed under the carryback promissory note for the ELI equity (the "Note") from $250,000 to $50,000, in consideration for his release from most for his obligations as required by the ICA, including the covenant not to compete in the original ICA. *See* Debtor's Exhibit 2, ¶3. The Debtor would be allowed to continue teaching using the RMLC curriculum

3

providing students with a certificate of completion.  However, he was expressly not allowed to confer the designation of "CLS."  *See* Debtor's Exhibit 2, ¶3.

14.     Even after the Debtor signed the Amended ICA in April 2011, he found it necessary to denigrate the Flukens' management of ELI.  Testimony and documentary evidence was presented at the Hearing showing that the Debtor sent e-mails making disparaging comments about the Flukens to various parties who were instrumental in ELI's ability to do business.  In an e-mail to Frank Spallitta, a laser supplier with whom ELI did business, the Debtor told Mr.  Spallitta that Ray Fluken "doesn't really understand this profession," that asking the Debtor to leave was "business suicide," and that since ELI "let 50% of the original staff go…it doesn't sound good."  *See* ELI's Exhibit S.  He also sent an e-mail to RMLC's landlord, Phil Low, claiming that Mr. Fluken was "going to close the school in the next 30 days" while asserting that he, the Debtor, was working with ELI's bank to resolve alleged issues with the loan so that the Debtor could "resurrect that damage that has been done."  *See* ELI's Exhibit HH.  Finally, the Debtor took it upon himself to notify David Johnson at ABC Bank, ELI's bank, that Mr. Fluken would be shutting down the business and asking Mr. Johnson to notify the Debtor if ELI stopped making loan payments.  *See* ELI's Exhibit JJ.

15.     Among the assets that the Flukens purchased were a number of internet domain names that were property of RMLC.  *See* ELI's Exhibit JJJ.  However, that did not prevent the Debtor from using them when his need arose.  At the Hearing, the Debtor testified that the domain names were not included in the sale.  Even though RMLC paid the web site hosting fees for those domain names, *see* ELI's Exhibit JJJ, the Debtor claimed that they belonged to him.  The evidence contradicts the Debtor's assertion of ownership.  The Debtor further stated that the domain names were not listed as assets of RMLC and therefore were not part of the sale despite the fact that the Flukens purchased one hundred percent (100%) of ELI's stock, not its individual assets,[2] and all RMLC's assets were transferred to the Flukens by the execution of the PSA.  In addition, the domain names were listed as part of the sale according to a Due Diligence Checklist prepared by the Debtor's attorney prior to the PSA being executed by the parties.  *See* ELI's Exhibit D, p.3.

16.     After the Flukens discovered the extent of the Debtor's "behind-the-scenes" activities, the Debtor was fired in May 2011.  He then started a business named Chromos Inc. ("Chromos") which was associated with a website called laserlaser.com.  The full extent of Chromos' business was not made clear at the Hearing, but it would appear that it provides education and sales of lasers similar to ELI.   No longer subject to the non-compete clause of the ICA, the Debtor found additional ways to injure ELI by continuing his attempts to take business away from RMLC.  Specifically, the Debtor used the domain name "www.no-hair.com", which had been expressly included in the sale to the Flukens, *see* ELI's Exhibit D.  He also advertised courses by giving the impression they were being provided by RMLC and offering to confer a CLS.  *See* ELI's Exhibit X dated July 14, 2011.  Apparently, in order to ensure that potential students sought classes from the Debtor and not RMLC, the no-hair.com website provided the following caution:  "Please beware of colleges and clinics that say that they are affiliated with

---

[2]  ELI/Flukens' Counsel Q:  "When you buy 100 percent of a stock of a company, along with it comes everything that the company – control over everything that the company owns, correct?"
Debtor A:  "That is correct, but these websites were run by me and they never asked for them."  Transcript of Hearing, Oct. 7, 2013, p.96 l.18-22.

the Rocky Mountain Laser College and Lorenzo Kunze.  Ask to speak to Lorenzo before doing business with any college or clinic." *Id.* at p.9.  The Debtor's advertising, his promises to confer a CLS, and the cautionary proviso violated the terms of the Amended ICA.

      C.     <u>U.S. District Court Litigation</u>

      17.     As a result of the foregoing, on July 21, 2011, ELI filed its Verified Complaint in the United States District Court for the District of Colorado, case number 11-cv-01907-RM-KMT[3] (the "USDC Case")[4] against the Debtor, Larry Paul Kunze, Jr. ("Kunze Junior") and various third party defendants (collectively, the "Defendants").  The Complaint alleged that the Defendants (1) violated federal trademark law through the unauthorized use of ELI's marks purchased in connection with the stock purchase of ELI by the Flukens, (2) used false advertising claiming that the Debtor was still affiliated with ELI in its operation of the RMLC, (3) misappropriated ELI's trade secrets, (4) obtained an amendment to the ICA through threats, (5) breached the ICA with ELI, (6) converted property belonging to ELI, (7) defamed ELI, and (8) engaged in unfair or deceptive trade practices to the detriment of ELI (the "Complaint").  *See* Complaint, USDC Case docket No. 1.

      18.     On September 12, 2011, the Debtor and Kunze Junior filed their Verified Answer and Counterclaims (the "Answer") and Third-Party Complaint (the "Counterclaims"), *see* USDC Case docket #37, against ELI and the Flukens.  Along with denials and defenses to the Complaint, the Answer alleged that ELI failed to pay the Defendants' wages, committed civil theft, anticipatorily breached the Note, and the Defendants sought declaratory judgment against ELI.  In addition to the assertions in the Answer, the Defendants filed Counterclaims against the Flukens alleging anticipatory breach of contract, civil theft, unjust enrichment, and seeking declaratory relief.  All of the claims for relief in the USDC Case are non-core matters pursuant to Section1334 of Title 28 of the United States Code as they are based on either federal trademark law or Colorado state law.

      19.     The parties engaged in lengthy pre-trial discovery as evidenced by the docket for the USDC Case.  There were motions to compel discovery, for preliminary injunctions, and for extensions of time to amend complaints and counterclaims based on evidence unearthed in discovery.  This discovery period was concluded on October 31, 2012 when the case was set for a five-day bench trial on April 22, 2013.  *See* USDC Case docket #169 and #170.  Even so, that did not halt the litigation activity as ELI filed a motion for an order to show cause and one of the Defendants filed a motion for sanctions.  *See* USDC Case docket #171 and #175.  By March 16, 2013, all of the non-debtor defendants except for Kunze Junior had been dismissed from the USDC Case.

---

[3] The USDC Case was originally assigned to Judge Brimmer but was reassigned to Judge Moore effective May 1, 2013.
[4] The Court takes judicial notice of the pleadings and docket of the USDC Case pursuant to Federal Rule of Evidence 201(b).

D.   Bankruptcy Petition

20.   On March 16, 2013 (the "Petition Date"), the Debtor filed his petition for chapter 13 bankruptcy relief (the "Petition") staying the USDC Case.  The Debtor concedes he did this with the express intent of delaying the USDC Case.  *See* Response to Creditor's Closing Statement Regarding Motions to Confirm Amended Plans at p.5.  The Debtor claimed that he had run out of funds to continue paying professionals' fees in the USDC Case.  The Debtor's justification for the forum change was that in the event ELI and the Flukens prevailed in the USDC Case, any judgment would not be subject to the superdischarge of Section1328 of the Bankruptcy Code, thus making the bankruptcy filing a permissible means of delaying the USDC trial.  The Debtor testified that he had already spent $150,000 to defend/prosecute the USDC Case and he was low on funds.  However, according to the USDC Case's docket it appears that the majority of the litigation expenses had already been incurred as the discovery phase of the litigation was complete and, by the Debtor's own testimony, he had already paid expert witnesses.

21.   There have been a number of deficiencies in the Debtor's schedules.  Primarily, the Debtor originally failed to disclose a number of financial transfers.  First, he did not include the payment of $50,000 to his non-debtor wife, Martha Kunze ("Mrs. Kunze"), immediately preceding the filing of the Petition as required by the Statement of Financial Affairs ("SOFA").  He stated that he was repaying a loan Mrs. Kunze had taken out of her 401k account and transferred to the Debtor for payment of his litigation expenses in the USDC Case including witness and attorney's fees (the "401k Loan").  He did not disclose the 401k Loan until he filed his second amended SOFA on October 4, 2013, the eve of the Hearing.  Second, the Debtor conceded he originally failed to disclose that he withdrew $40,000 from his IRA account post-petition (the "IRA Distribution").  Apparently, the distribution was needed to fund the start-up costs and other expenses for the Debtor's new business venture.  Again, he did not disclose that until he filed the Second Amended SOFA.  Nor did he account for it in his Business Income and Expenses Statement attached to Schedules I and J (the "Business Expense Form") or his Amended Business Expense Form filed on October 4, 2013 (the "Amended Business Expense Form").

22.   The Debtor's earnings in the two years prior to the Petition Date have also changed with each amendment to his SOFA.  The following information as set forth on Debtor's SOFA illustrates those discrepancies:

Table 1

|  | Original SOFA | 1st Amended SOFA | | 2nd Amended SOFA | |
|---|---|---|---|---|---|
| 2013 (YTD) |  | Lorenzo Org'n | ($9,690) | Lorenzo Org'n | $5,250.77 |
|  |  | Chromos Inc. | ($9,795) | Chromos Inc. | $17,156.20 |
| 2012 | $74,861 | Lorenzo Org'n | ($24,083) | Lorenzo Org'n | $216,874.05 |
|  |  | Chromos Inc. | ($14,912) | Chromos Inc. | $200.00 |
| 2011 | ($23,322) |  | ($23,322) | Amer. Laser College | $231,350.00 |
|  |  |  |  | Lorenzo Org'n | $20,525.00 |
| 2010 | ($63,966) |  | ($63,966) |  | $132,189.00 |

6

No evidence has been presented to satisfactorily explain the changes in the Debtor's income.

23. At the Hearing, the Debtor's attorney disclosed that the Debtor had overlooked $100,000 paid by the Flukens in consideration for the ELI stock in 2009 when filing his 2009 tax return. This would most likely result in a revised tax bill for 2009 and an increased priority claim from the IRS.

24. Likewise, the value of his personal property went from approximately $116,000 in the original Schedules filed on the Petition Date, to $147,840.54 in the First Amended Schedules filed on July 11, 2013, to $200,000 in the second amended schedules filed on October 4, 2013. In the Second Amended Schedules, the Debtor makes the first acknowledgement of the IRA Distribution withdrawn on June 24, 2013.

25. There are also inconsistencies in the Debtor's Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("Form B22C") and his Business Expense Form. The Form B22C is a historical statement covering the six months prior to the Petition Date whereas the Business Expense Form is a listing of current and projected income. Originally, the Debtor left blank the entries for income from wages or the operation of a business on his Form B22C. When the Debtor amended his Form B22C (the "Amended Form B22C") on July 9, 2013, four months after the Petition Date, he claimed to have gross receipts from operating a business of $11,084.34 and operating expenses of $15,848.34. On his Amended Business Expense Form, filed on October 4, 2013, the Debtor stated that he had a regular business income of $11,000 per month and business expenses of $5,792 per month which was the same amount listed on the original Business Expense Form. The Debtor does not give any explanation of how he has or will cut his business expenses by nearly one-third from $15,848.34 to $5,792. Nor has he provided specific information on how the $40,000 IRA Distribution was spent.

26. Furthermore, the Debtor has not been able to satisfactorily explain the distribution of the proceeds received from the sale of ELI to the Flukens. The Debtor was paid approximately $750,000 in 2009 and 2010 in exchange for his ownership interest in ELI. The Debtor testified that he used $250,000 to pay down his second mortgage which is supported by a wire transfer from his bank account to "WF Home Equity." *See* ELI's Exhibit I. However, even with that transfer on February 2, 2010, according to the Debtor's Schedule D, the amount drawn on the Debtor's home equity line of credit as of the Petition Date had returned to its borrowing limit without explanation. Next, the Debtor claims that he used another $250,000 for improvements in his home yet did not have any contracts or invoices to support that claim. Finally, the Debtor says that he has spent $150,000 defending the USDC Case. The foregoing explanations fail to satisfactorily account for the receipt of $750,000 just over two years before the Petition Date.

E.   Plan Confirmation Hearings

27. The Debtor's original plan was set for a confirmation hearing on May 23, 2013. Objections were filed by the Chapter 13 Trustee and the Flukens. The Court denied confirmation of the Debtor's plan and set a status conference for July 25, 2013, regarding the

Debtor's forthcoming amended plan. The Debtor filed his First Amended Plan on June 13, 2013. At the status conference on July 25, 2013, the Court set the Hearing for October 7, 2013. Since the Flukens' objections would not be materially addressed in any plan the Debtor might file, the parties agreed the Court should conduct an evidentiary Confirmation Hearing. The Debtor filed his Second Amended Plan (the "Plan") on October 4, 2013, the Friday afternoon before the Hearing set for the following Monday morning.

28.     At the Hearing, the Court heard testimony from the Debtor and Mr. Fluken. The Court finds that the Debtor's testimony is often contradicted by the documentary evidence. For that reason, the Court does not find the Debtor's explanations of various events to be credible. On the other hand, Mr. Fluken's testimony proved more credible both in demeanor and evidentiary support.

29.     Additionally, at the Hearing, the Court heard testimony from Mr. Scott Page ("Mr. Page"), a Certified Residential Appraiser, *see* ELI's Exhibit ZZ, hired by ELI, and from Mr. Phillip Barru ("Mr. Barru"), a realtor and appraiser, *see* Debtor's Exhibit 6, hired by the Debtor. Mr. Page and Mr. Barru testified as to their opinions of value for the Debtor's residence. Mr. Page is a Certified Residential Appraiser and has been appraising real estate in Denver since 1991. His report was a very thorough, thoughtful evaluation of the Debtor's residence using appropriate comparables. Mr. Page appraised the value of the Debtor's residence at $932,000 as of September 10, 2013. *See* ELI's Exhibit ZZ. Conversely, Mr. Barru did not appear to have done as comprehensive an analysis and report as Mr. Page. He did not provide as many details about how he evaluated the residence, made required valuation adjustments or why his comparables did not have similar features to the Debtor's residence.

30.     On March 15, 2013, prior to doing a full appraisal, Mr. Barru gave the Debtor a Broker's Opinion of the home's value as being $650,000. *See* Debtor's Exhibit 7. When he completed the appraisal on the next day, Mr. Barru appraised the residence value at $720,000. *See* Debtor's Exhibit 6.

31.     Based on the two competing appraisals and in light of the Debtor's testimony that he made $250,000 in improvements to the residence in the two years prior to the Petition Date, the Court finds the testimony and report of Mr. Page to be more persuasive.

II.     DISCUSSION

Based on the circumstances presented in this case, the confirmation objections raised, and the testimony given at the Hearing, this Court must determine not only whether the Debtor's Plan should be confirmed, but also whether this case should be dismissed or converted as a bad faith filing. The focal point of both issues, plan confirmation and dismissal/conversion, is whether the Debtor has acted in good faith.

A.     Plan Confirmation

For the Debtor to succeed in confirming his Plan, he bears the burden of proof concerning the elements of Section1325(a) of the Bankruptcy Code. *In re Anderson*, 173 B.R. 226, 229 (Bankr.D.Colo.1993); *Lincoln v. Cherry Creek Homeowners Ass'n (In re Lincoln)*, 30 B.R. 905, 910 (Bankr.D.Colo.1983).

Those elements are: (1) does the plan comply with the provisions of chapter 13 and Title 11; (2) have any required statutory fees or charges been paid; (3) was the plan proposed in good faith; (4) does the plan pay unsecured creditors more than they would receive in chapter 7, (the "best interests test"); (5) using one of three listed alternatives, are secured creditors treated fairly and equitably in the plan; (6) can the debtor make all the payments under and comply with the plan, the ("feasibility test"); (7) was the act of filing the petition in good faith; (8) has the debtor satisfied any domestic support obligations; and (9) has the debtor filed all federal, state and local tax returns. *See* 11 U.S.C. § 1325(a). Specific objections have not been raised as to a number of these factors, (1), (2), (5), (6), (8) and (9). Although the Debtor did not provide direct evidence which satisfies the burden of proof for such factors, there is sufficient evidence in the record to deem those elements satisfied. The elements specifically at issue are whether the Plan is proposed in good faith,[5] whether the Plan passes the best interest test,[6] and whether Petition was filed in good faith.[7] Additionally, an objection has been raised regarding the Debtor's ability to meet the requirement of Section 1325(b)(2)(B), the "Disposable Income Test."

1.    Good Faith Filing of the Plan – Section 1325(a)(3)

The first issue is whether the Plan satisfies the good faith requirement of Section 1325(a)(3) in order to be confirmable. To determine whether a plan has been filed in good faith under Section 1325(a)(3), the Tenth Circuit historically applied the non-exhaustive list of *Flygare* factors. The *Flygare* are as follows:

> (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.

*In re Cranmer*, 697 F.3d 1314, 1318–19 (10th Cir.2012) (citing *Flygare v. Boulden*, 709 F.2d 1344, 1347–48 (10th Cir.1983)).

Subsequently, the Tenth Circuit in *Cranmer* noted that after *Flygare* was decided, the Bankruptcy Code was amended to include Section 1325(b) which criteria subsumes most of the *Flygare* factors, and therefore, the good faith inquiry now "has a more narrow focus." *In re Cranmer*, 697 F.3d 1318–19. Consequently, a bankruptcy court must consider "factors such as

---

[5] 11 U.S.C. § 1325(a)(3).
[6] 11 U.S.C. § 1325(a)(4).
[7] 11 U.S.C. § 1325(a)(7).

whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Id.*; *see also Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 n. 7 (10th Cir.1993).

       a.  *Cranmer* Factor 1:  Has the Debtor stated his debts and expenses accurately?

The Debtor has filed his Statements and Schedules with the Court three times.  While on its face, this is not objectionable, the degree of changes causes concern.  Specifically, the Debtor's amendment of his Form B22C from having no income whatsoever to having an income from the operation of a business of $11,000 per month is of serious concern, as apparently the Debtor's income is derived from Chromos, a start-up business.  There is also an inconsistency with the Debtor's valuation of his residence.  The Court notes that even though the Debtor received an appraisal valuing his house at $720,000 as of the Petition Date, the Second Amended Plan, which was filed on October 4, 2013, values the residence at $650,000 as it was in the original Plan.  The inconsistency in these figures makes it impossible for the Court to determine the legitimacy of the Debtor's proposed plan payments.[8]

Moreover, the Debtor's Plan has failed to account for the Claims filed by ELI and the Flukens which may represent significant claim amounts when finally liquidated.  ELI and the three Flukens have each filed the Claims in the amount of $779,030, none of which have been objected to by the Debtor.  He also, however, has not provided any means of addressing these potential claims in his Plan.  Pursuant to Section 502(a), a claim is deemed allowed unless an objection has been filed.  The Claims have not been mentioned in the Plan.  Moreover, the Debtor's Plan provides no notice to his general unsecured creditors that there could be allowed Claims in his case which may dwarf the total amount currently listed in Class Four, $46,550.  Failing to  provide how such large Claims may be addressed as part of a plan does not adequately put the rest of the Class Four general unsecured creditors on notice that the one hundred percent (100%) distributions promised by the Debtor may be greatly reduced should the Claims be allowed.  The Debtor cannot simply ignore the existence of these Claims in hope of confirming a plan that does not acknowledge them, provide a mechanism for their resolution, and disclose their adverse effects on unsecured, and possibly other, creditors.  The Plan's statements of debts, expenses and percentage repayment of unsecured debt remain inaccurate despite the Plan having been amended twice.  The Court therefore finds that this factor weighs against the Debtor.

       b.  Has the Debtor made any fraudulent misrepresentation to mislead the
          bankruptcy court?

The discussion of the Debtor's Business Expense Form raises similar concerns as to this factor.  The Debtor had not been forthcoming with the Court regarding the state of his financial affairs until called upon to do so by ELI and the Flukens in two respects.  First, the Debtor did not disclose the pre-petition repayment of his wife's $50,000 401k Loan until the eve of the Hearing even though he had filed the First Amended SOFA in July.  Second, he took  his own $40,000 IRA Distribution without noting this fact in any pleading or schedule before filing his Second Amended SOFA on the eve of the Hearing.  Finally, the Debtor did not disclose his

---

[8] As previously indicated, the Court found the appraised value of $932,000 by Mr. Page more persuasive.

failure to account for $100,000 of the additional proceeds from the ELI stock sale in his 2009 tax return until the day of the Hearing.  The Court does not consider the Debtor to have been forthcoming in his chapter 13 filings.

      c.   Has the Debtor unfairly manipulated the Bankruptcy Code?

The Court finds this to be the most pertinent and crucial factor in this case.  The Debtor's Chapter 13 case, in this Court's view, is a clear example of forum shopping by the Debtor.  This Court's review of the USDC Case file shows an extensive amount of pre-trial litigation between the parties.  The timing of the bankruptcy filing, five weeks before the five-day trial was set to begin and months after discovery had been completed, is indicative of forum shopping.  In fact, the Debtor's closing argument states that the Petition was filed to prevent the litigation from going forward but claims it was on account of a shortage of funds.  That argument is not persuasive when the bankruptcy case was filed after the conclusion of a year-long discovery process, the hiring (and paying) of experts, and five weeks before the trial date.  The fact that the Debtor, on the eve of bankruptcy, chose to re-pay his non-debtor wife a $50,000 reimbursement for USDC litigation expenses advanced  and  took the undisclosed post-petition IRA Distribution to fund Chromos does not support the Debtor's explanation that he had run out of funds to continue the USDC Case.  The USDC trial would have given both sides an answer to their disputed claims and possibly have ended the litigation.  Instead, eight months later, the Plan has not been confirmed and the parties are still litigating.  The Court does not find the Debtor's stated motivation for the bankruptcy filing a sincere one.

The Debtor has sought the jurisdiction of the Court purportedly to streamline the resolution of the USDC Case by representing that the dispute with ELI and the Flukens can be decided by the Bankruptcy Court in an abbreviated 1-2 day hearing instead of five days in the District Court.  That seems unlikely for a number of reasons:

      (1) the evidentiary confirmation Hearing alone took a day and a half with closing arguments done in writing and without litigating fully the issues arising in the USDC Case;
      (2) this Court has concerns about its jurisdiction to liquidate the Claims and the Debtor's Counter Claims  based on the decision in *Stern v. Marshall*, –––– U.S. –––––, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011); and
      (3) its review of the evidence convinces the Court that it must consider whether or not to abstain from hearing the matters already pending in the USDC Case.

As indicated, the Court questions whether it has authority to liquidate the Claims and Counter Claims.  In *Stern*, "the United States Supreme Court held § 157(b)(2)(C) granted bankruptcy courts the statutory authority to render final judgments on the core matter of a debtor's counterclaims against a claimant; however, bankruptcy courts 'lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.'"  *In re CCI Funding I, LLC*, 2012 WL 3421173, *6 (Bankr.D.Colo. Aug. 15, 2012).  All of the issues presented in the USDC Case are considered non-core in the Bankruptcy Case and over which this Court may not have jurisdiction.  Specifically, the Debtor/Defendants' counterclaims are based solely on Colorado state law and the Court cannot now state with certainty that these issues would not be resolved in the process

of ruling on the ELI and Flukens' Claims.  Requiring the parties to litigate their case in a court with an arguable jurisdictional defect when there is already a case pending and ready for trial in a court with unquestioned jurisdiction would benefit no one.

With respect to abstention, the Court also has concerns that this proceeding would qualify for abstention.  This is clearly a two-sided dispute between the Flukens and ELI as Plaintiffs and the Debtor and Kunze Junior as Defendants.  Even if this Court were to allow ELI and the Flukens to liquidate their respective Claims and the Debtor his counterclaims in this Court, the U.S. District Court would still have to hear the case with respect to Kunze Junior.   Such a situation runs the risk of disparate results.

In this Court's view, the Debtor's Chapter 13 filing has been a last-minute effort to enlist the resources of the bankruptcy court as a litigation tactic to delay or avoid the USDC Case, not an honest effort by the Debtor to repay all his creditors.  Based on both the *Flygare* factors and the *Cranmer* decision, the Court finds that the Debtor's Second Amended Plan cannot be confirmed because the Debtor's Plan was filed in bad faith in violation of Section 1325(a)(3).

### 2.    Best Interest Test – Section 1325(a)(4)

The Court finds the Plan cannot pass the "best interest test" as required for plan confirmation by Section 1325(a)(4) for its failure to advise his general unsecured creditors on what an eventual allowance of the Claims may mean for Debtor's Class IV creditors.  According to the Plan, the Debtor will pay his Class IV unsecured creditors one hundred percent (100%), making the question of whether those creditors would do better under chapter 7 moot.  However, since the Debtor has not objected to the Claims, they are deemed allowed pursuant to Section 502(a).  Therefore, since the Bankruptcy code requires the Debtor to include the Claims in the chapter 7 reconciliation calculations, the Court believes it must look at what the projected pay out to creditors would be if the Debtor had filed a chapter 7 case.  According to the Plan, the Debtor would pay an estimated $88,579 to unsecured creditors in a chapter 7 versus the $46,550 projected to be paid under the Chapter 13 Plan.  And, if only one of the four Claims asserted by the ELI and the Flukens were to be allowed in the amount of $779,030, the distribution to unsecured creditors would fall to approximately five percent (5%).  The other Class IV unsecureds should be informed of this, despite that their vote is not required for the Court to confirm the Plan.  They may wish to receive a more rapid, certain payout under Chapter 7.

Another significant unknown is the Debtor's priority tax liability.  At the time of the Hearing, the Debtor had not filed his amended 2009 tax return to include $100,000 of additional income from the sale of ELI.  There is no such provision in the Debtor's Second Amended Plan.  The Debtor has not provided the Court with any information regarding the status of that potential tax claim, having only recently consulted a new accountant despite being several months into the chapter 13 case.

The Court also has noted that the Debtor's Plan does not consider the additional non-exempt equity that may be available from an accurate valuation of his residence.   Failure to account for such an increase in potential funds for all creditors, and the previous noted deficiencies, do not satisfy the "best interest test" standard of Section 1325(a)(4).

12

3.     Good Faith Filing of the Petition – Section 1325(a)(7)

Section 1325(a)(7) reaches back to the Petition Date to determine if not only the Plan was filed in bad faith, but also whether the Petition was filed in bad faith. Filing a plan in bad faith does not necessarily mean that the petition was filed in bad faith, though the analysis is similar in evaluating both. The Seventh Circuit addressed the difference in *In re Love*, 957 F.2d 1350 (7th Cir. 1992), in the context of which party bears the burden of proof and has been cited with approval by the Tenth Circuit in *In re Gier*, 986 F. 2d 1326 (10th Cir.1993).

> [T]he wording of Sections 1325 and 1307 are distinguishable so that even if the debtor has the burden of proving good faith under Section 1325 it does not mean that the debtor must bear the same burden under Section 1307's provisions. This is because Section 1325(a)(3) explicitly states that a plan shall be confirmed if it "has been proposed in good faith." On the other hand, Section 1307(c) does not specifically require that a debtor file a petition in good faith. Instead, Section 1307(c) provides that a petition may be dismissed "for cause." Dismissal for cause cannot mean that a debtor must show an absence of cause; it can only mean that the party moving for dismissal must demonstrate cause.

*In re Love*, 957 F.2d 1350, 1355 (7th Cir.1992)(internal citations omitted). "The addition of § 1325(a)(7) by BAPCPA lends further support for the view that a more stringent test should be applied under § 1307(c). Under § 1325(a)(7), courts have authority to take the less drastic step of denying confirmation of a chapter 13 plan if the petition is not filed in good faith, rather than dismissing the case." *In re McDonald*, 2013 WL 1969266, *10 n.65 (Bankr. D.Colo 2012).

Since the standard for Section 1307(c) is more stringent than that of Section 1325(a)(7), applying the test for Section 1307(c) will by definition encompass the application of Section 1325(a)(7) to the Debtor's Plan. The Court will address this issue below when it addresses Section 1307(c).

4.     Disposable Income Test – Section 1325(b)(1)(B)

The Disposable Income Test of Section 1325(b)(1)(B) requires the Debtor to prove that he will contribute all of his disposable income to his Plan for its duration. "[T]he court may not approve the plan unless, as of the effective date of the plan – (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period …will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). The problem for the Court in this case is that it has no knowledge of what the Debtor actually has in the way of disposable income. As previously discussed, there is significant confusion regarding the Debtor's true income and expenses based on his multiple and widely shifting financial filings in this case. There have been so many inconsistencies that the Court knows no more now about the state of the Debtor's true finances than it did as of the Petition Date.

13

Prime examples of the inconsistencies in the Debtor's filings are his SOFA filings as portrayed in Table 1, *supra*. The variances between the original SOFA and the Second Amended SOFA are as great as $254,673, but the Debtor failed to provide any explanations for that wide shift in his income. Other examples are the Debtor's Business Expense Forms. According to his filings, the Debtor currently has a gross income of $11,000 per month and expenses of $5,792 per month. However, according to the Amended Form B22C, filed on the eve of the Hearing, he has historically had $11,084.34 of income and $15,848.34 in expenses. The Debtor has stated that this income comes from Chromos, his start-up business. Being a start-up business, the Court finds it difficult to understand how Chromos' expenses were cut by almost two-thirds seemingly overnight. The Debtor apparently needed to take a $40,000 IRA Distribution post-petition to meet his expenses, raising doubts about the Debtor's current projections showing the availability of funds for his Plan. If the explanation lies elsewhere, it was the Debtor's burden to provide it.

The Debtor's evidence in support of plan confirmation offers little for this Court to determine which, if any, financial filing is accurate. Assuming the latest statement filed under oath is the most accurate, the Debtor's expenses exceed his income and any chapter 13 Plan he may file under such circumstances could not provide sufficient income to satisfy Section 1325(b)(1)(B).

Moreover, the Debtor does not have any employment history by which this Court can estimate his projected disposable income over the course of the Plan. He stated at the Hearing that Chromos is his source of income. As Chromos is a start-up company, there is too little operating history from which an adequate projection of business income and expense can be made. And, the Court has not been assured by the Hearing evidence that Chromos is not merely another vehicle or entity through which the Debtor may continue to violate the terms of the PSA or the Amended ICA. Nor has the Debtor provided the Court any assurance that he will actually pay the full amount of his disposable income, whatever that may be, to his Plan. For these reasons, the Court finds that the Plan fails to meet the requirements of Section 1325(b)(1)(B).

B.   Dismissal or Conversion

Once a plan has been denied confirmation based on a finding of bad faith, the issue arises of what happens next. Should the Debtor be given a chance to file a new and improved amended plan or should the case be dismissed or converted for cause? Section 1307 states that "after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including – (5) denial of confirmation of a plan under Section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan." 11 U.S.C. § 1307(c). The Court is authorized to dismiss or convert the case *sua sponte* after giving the Debtor notice and the opportunity for a hearing if it determines dismissal or conversion is in the best interest of the Debtor's creditors. That authority stems from Section 105(a) of the Bankruptcy Code which states, "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). *See also Rosson v. Fitzgerald (In re Rosson),* 545 F.3d 764, 771 n.8 (9th Cir.2008) ("Although the statute provides for conversion 'on request of a party ... or the ... trustee,' there is no doubt that the bankruptcy

court may also convert on its own motion.")(internal citations omitted).  Therefore, the Court may dismiss or convert a case after the notice and a hearing requirements of Section 1307(c) have been met.

Accordingly, IT IS THEREFORE ORDERED that the Confirmation of Debtor's Second Amended Chapter 13 Plan is DENIED and by separate order, this Court shall issue an Order to Show Cause regarding the following issues:

1)  whether the Debtor should be allowed to file a Third Amended Plan; or

2)  whether the Debtor's Chapter 13 case should be dismissed or converted; and it is

FURTHER ORDERED, depending on the Court's answer to these questions, the Court will address , if necessary, whether the Court will or will not abstain from hearing the Claims and Counterclaims raised in the pending U.S. District Court case.

Dated this 20th day of December, 2013.

BY THE COURT:

_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court